Our next case this morning is 25-1486, United States v. Johnny Barros Brandao, Appellant's Counsel, please. Can I please reserve two minutes? You may. Thank you. Good morning, Your Honors. May it please the Court, my name is Jalees McDonough and I represent Johnny Barros Brandao. The only information given to potential jurors before being selected to serve in this case was that generally the government charges Mr. Brandao with knowingly making a false statement on a passport application. The first statement out of the government's mouth when they opened to the jury was that in 2022 the defendant, Johnny Brandao, was charged with serious offenses in Cape Verde, including two homicides. This case is not about those charges, this case is about what the defendant did to avoid facing those charges. It was not until that point in time that the jury learned that they were seated on a very different case than they were informed of that they would be selected for prior to jury empanelment. Today I'd like to address two issues from my brief, first whether it was unduly prejudicial for the jury to learn that Mr. Brandao was charged specifically with two homicides in Cape Verde, and whether Brandao's right to a fair and impartial jury was infringed upon by not being informed at the outset that Mr. Brandao, his alleged entire motive for the offense was that he had been charged with two murder charges in Cape Verde and was attempting to flee those charges. Counsel, I'd like to get a sequence of events clear in my mind. I have a timeline here that indicates on September 3 of 2024, that's when the government filed its motion in Lemonade to admit the evidence of the defendant's prior charges, you opposed that motion. Then on September 16, the court has not yet ruled on that motion, so you don't know what the court's going to do with it. Then you submit your voir dire. In that voir dire, were you asking for the opportunity to ask the jurors about how they would react if they became aware that the defendant had been charged with homicide? Even though in response to the motion in Lemonade, you didn't want the jurors to know about, I'm trying to understand whether there was some inconsistency in your position with respect to juror awareness of these homicide charges. Your Honor, the intention was that if the homicide charges did come in, if there was an adverse ruling on our motion in Lemonade and the court allowed the government to educate the jury as to why he was allegedly fleeing Cave Verde, that the jurors would be asked about the homicide charges. So you made that point explicit in proposing the voir dire questions. It was sort of a conditional, if you're going to let this in, we need to be able to ask the jurors how they would feel about the evidence of homicide. I'm not sure I made it explicit as far as that exact language, Your Honor, but that was what was implied, that if the homicide charges are coming in, then we would want a question as to the alleged homicide charges. If there was no mention of homicide, then sure, we wouldn't have wanted that question asked. If he was just being told that there were criminal charges in Cave Verde and that's why he allegedly fled, then I think it would be a completely different story. Isn't that the preservation problem, I think, that Mr. Lockhart's brief raises, which is, sure, you submit a list of questions, the judge then creates their own list of questions that they're going to read to the panel, and you see that, right, before it's done. So, Your Honor, the first time that we learned what the questions would be was when the court recited them to the jury during empanelment, and the court did ask... You're not, in Massachusetts, you're not given the questions ahead of time? We did not in this trial. We did not receive the questions ahead of time. The first time we were hearing the questions was when the jury was informed of the questions. And then afterwards, you didn't ask for the judge to give the additional question that you needed? No, Your Honor, but I think the preservation case law, it's to put the court on notice of what the parties are looking for. Right, but it does seem to me that this isn't sort of, like, where the, you know, that works where the issue is sort of really joined, but as Judge Lopez's questions sort of suggest, this is a moving target, you know, and I think it's unusual you didn't get them beforehand, but even if you didn't, like, at some point, it feels like the judge should be told, you know, I submitted two weeks ago a bunch of questions, and you didn't ask an important one, because it's not, it's not like you filed a motion that he denied, and then you move on because he denied it. This is just a list of questions that he's going to pluck some from this one and some from that one and create his own, and it seems like there's a little more of a burden to let him know, I'm not happy with what you did here. Your Honor, I would point out that I think it was clear to the judge that we were, we felt that the homicide charges were very prejudicial. We filed both an opposition to the government's motion, and we filed a motion just to exclude it, and I would point out that the court was on sufficient notice that we were looking for the murder question, because we filed a list of questions, and the court asked every single question other than that question, so I think the presumption is that he considered it and rejected it.  I mean, that could have been a mistake. Like, that's the problem. You didn't say to the judge, where's the murder question? Yes, Your Honor, I think it was clear that we felt that the homicide charges were so prejudicial that it was a necessary question to be asked of the jury before the state. I mean, you may be right about that, and we're going to talk about that in a second, but on the jury, on the voir dire question, oversights happen, the point of preservation rules is to make sure that we know it wasn't an oversight or a mistake, it was an intentional decision, and I think by not bringing it up, we don't know that. I think we don't, we may not know either way, Your Honor, but I think the homicide was such a central issue. Well, we would have known if you had said to the judge, we need the murder question. He says, I'm not giving you that for whatever reason. Yes, Your Honor, well, I think either way, the charge was so prejudicial, and if I could address that point as to why it was so prejudicial, if we look at, kind of just get down to exactly what we're weighing, we're weighing not so much that there was criminal charges in Cape Baird, but specifically whether telling the jury that two homicide charges were so relevant that they weren't unduly prejudicial. The government outlines each of the, kind of, prongs for the relevancy of this information that it had to, they needed it to create, kind of, context for why the passport was seized. They needed it to explain why he would have had such a motive to fill out a false application. Well, it certainly goes to intent, right? You don't, you're not making a 404B, this doesn't have special relevance. You're making a 403, right? It does have special relevance, but its nature is so, sort of, over the top that it was unduly prejudicial, right? Yes, Your Honor. That is the argument we're making, and the government hasn't explained why informing the jury specifically that there were homicide charges, why that's more probative than just informing the jury that there were pending criminal charges, and even informing them that he was facing 15 to 30 years. There's no more probative value as to the fact that there were homicide charges. He could have been charged with financial crimes, drug crimes, anything that carried a penalty of 15 to 30 years, and under the government's theory, that's why he had the incentive to flee. It was that he was facing significant time in a foreign country, not so much that there were homicide charges. That doesn't give any more probative value to why he would have this motive, why he would have this intent to fill out the alleged false application. Counsel, let's assume there was a 403 error for the reasons you're suggesting. What about the, I'm curious about the harmless error issue, in the sense, you didn't put on any defense. You can certainly suggest a defense through cross-examination of the government witnesses. What was the defense, unless you're just going to say they didn't put on enough evidence, it wasn't credible, as was argued in the previous case, what was the defense that you were trying to suggest here, through cross-examination of the government witnesses? The government's case was largely put in through documents, where there was no live witnesses to explain the contents of the documents. We have these records from Cape Verde, which state that the charges against Mr. Brandeo were declared null and void, he was being released, that he was to stay in the country, but then they have the chain of custody forms to indicate that the documents were to be  There was no explanation as to who the documents would be returned to, and without live witnesses to explain that, there was questions for the jury. It seems like a really weird fact that the passport is lost in Senegal, but ends up at the prosecutor's office in Cape Verde. So what was suggested about why that wasn't a pretty dispositive fact? Your Honor, so there was evidence that on the passport it says that if anyone recovers a lost passport to return it to the nearest embassy, he put on his passport application that he lost it in Senegal, which is where the U.S. embassy is, and then we have evidence that after Mr. Brandeo is back in the United States, the embassy in Cape Verde reaches out to the Senegalese embassy and says, hey, you let this guy go who was pending homicide charges in our country. I think there was an open-to-interpretation that potentially the passports could have made their way to the embassy and then made it back to the clerk's office where they were supposed to be. There was no evidence of where the passport There was varying evidence as to that. Officer Pigman, who was the officer who had testified that he had originally taken photographs through a FaceTime call of the passport, he had previously testified in an affidavit that they were in the prosecutor's office and then there was some evidence that they were potentially in the clerk's office. So there was varying evidence as to where the passports actually were at any given time. And the passports weren't confirmed to actually be in the possession of the Cape Verdean authorities until five months after he had allegedly left Cape Verde, traveled to Senegal and then returned to the United States. So the theory was that the return to the Cape Verde authorities would be consistent with what was alleged to be the false statement that I lost my passport in a restaurant in Senegal and then it was found and then returned as apparently there's an instruction on a passport if found it should be returned to a certain place. Was that the theory? Well so the passport itself was admitted into evidence and there's statements on the passport that states that if it's found it should be returned basically to the closest embassy. And it wasn't our burden to prove, it was the government's burden to prove that at the time that Mr. Brandeo made the statement that it couldn't have possibly been in his possession because it was within the possession of the Cape Verdean authorities. And where there was these ambiguous documents as to the chain of custody in the Cape Verdean records where there was no live witness to explain what the documents actually meant and that there was no definitive proof as to where the passport was until five months later when the lead investigator attempted to take photographs through a FaceTime call of the passport. Our position was essentially that the government did not prove that at the time that the statement was made in the passport application that it was false or that they even knew definitively where the passport was at that point. So it was more of a, they didn't prove beyond a reasonable doubt that at the time the statement was made that it was false because of all of these other factors and because they didn't have anyone to actually explain what we, our position was there were ambiguous records as to the chain of custody from the Cape Verdean documents. Thank you. Thank you. So, Mr. Lockhart, are you the 403 specialist in your office? It seems I am for this session. I'd like to start sort of in reverse order, beginning with the harmless error point, working to the merits of the 403 claim, and then concluding with the voir dire issue. So as to the harmless error, I mean, first of all, the defense closing gave the briefest nod to the theory that you've heard today in court. That theory is completely far-fetched. It depends on the idea that A, his passport was returned to him in Cape Verde, that he lost it in Dakar, Senegal, that somebody found it, returned it to the local embassy, and then the local embassy in Dakar said, oh, you know, we've just issued him an emergency passport. Now the original ones come back to us. We're just going to send it on to the prosecutor's office in Cape Verde. There is not a scintilla of trial evidence supporting any sort of theory as to why the local embassy in Dakar would have mailed this U.S. passport back to Cape Verde to the prosecutor's  office. There's a suggestion made for the first time in oral argument that there was trial evidence to the effect that the Cape Verde prosecutor's office reached out to the U.S. embassy in  I think I heard that suggestion. I've never heard that in the briefs. I'll go back and look at the trial evidence, because I don't remember any evidence coming in about communication from the Cape Verde prosecutor's office to the local U.S. embassy in Dakar. If there is, I'll stand corrected, but I would, you know, if there isn't, then you need to be very careful about that inference. I don't remember the defense closing suggesting anything along those lines. Would it not also have to be true that the Cape Verdean passport was lost, returned to the Cape Verde embassy in Senegal, and then somehow found its way back to the embassy? That's an additional factor, which makes it even more improbable, because we are talking about two I suppose the other thing was that it's possible that he wasn't given the Cape Verde passport back by the court. I suppose.  Yeah. It's sort of complicated. But there's, yeah, it sort of adds to the improbability. I mean, these passports, let's be clear, are in the files of the Cape Verde prosecutor's office in 2023. There's just no dispute about that. I mean, they're photographed. Every page of them is later photographed in 2024. So there's no way to say, oh, these aren't the actual passports, whether Cape Verde or U.S. The question is, if he somehow got them back, either one or the other, how is it that they magically reappeared in the files of the Cape Verde prosecutor's office after the fact? There's just no tenable sort of theory as to how that could be. But getting to the merits of the 403 issue, I'd like to start simply by quoting the key sentence from the district court's ruling here. Judge Gorton said that both the existence and the gravity of the outstanding criminal charges are probative of the defendant's knowledge and motive in this case, which is clearly true unless you understand the sheer gravity of what was charged, which is homicide. Sure. But the more you go up that scale for an unproven charge, the more prejudicial that becomes. And there were many things that could have been, he's charged with crimes. I understand why that might not have been sufficient. Could have been serious crimes. Could have been 15 to 30 years, I heard your friend say. But no, we go like to the far end of it's a double homicide. And yes, I follow why that's 404B, but I also follow why that's highly prejudicial. Right. And a couple of points in response to that, Your Honor. First of all, the question obviously is whether that extra piece, I mean, I think even my friend would admit that we are entitled at a minimum to get in the fact that this was a serious charge carrying the penalties that it did. Then the question is whether this extra piece, the label homicide, was substantially- Well, we put crimes from misdemeanor to the very worst. The one that's very worst is murder. Why did the government need it? Right. I mean, as Judge Aframe just indicated, you got an agreement. I mean, in terms of the gravity of the offense, being exposed to 15 to 30 years, that's pretty grave. Well, what the stipulation said was that the charges were serious and that they carried potential penalties of up to 15 to 30 years. The gravity of the crime is not brought home until you get to the word homicide. And I understand that that very word also increases the chance of unfair prejudice. But in terms of special- But if you stood up in closing and said, this guy ran, why did he run? He was facing 15 to 30 years in a Cape Verdean prison. That seems to get the point home. But now we get to stand up and say, not only that, he was charged as a double murderer. That seems to add a little bit, not very much on the 404B side, but quite a lot on the prejudice side. Well, first of all, the word is not murder. It's homicide. And there are gradations, as we know, of homicide. It was my sister who, in her closing, referred to this as a murder charge. And I guess what I would say, if you're looking at the question of whether this relevance was substantially outweighed by the danger of unfair prejudice, keep in mind, we are talking about charges. We're not talking about evidence of murders. This court has let in evidence of murders, primarily in drug cases. But note also that the 404B evidence, homicide, is very dissimilar to the underlying charge here. And the dissimilarity works against any claim of unfair prejudice, because it's really not very natural for a jury to draw the sort of propensity inference which says that, well, this is a guy who's charged with homicide. So therefore, he's the sort of guy who would commit passport fraud. That sort of propensity inference is a very sort of unnatural one for a juror to make. So although — Is the suggestion, then, if it had been limited to, say, 15 to — reference to 15 to 30 years that the jury might have thought that it could have been for fraud? Well, right, exactly. The jury could have thought any number of things. Because when you say serious, and you say possible penalties of up to 15 to 30 years, that doesn't really tell you that much about, A, the nature of the offense, or, B, the time that the defendant is realistically actually going to face possible penalties. What the nature of the offense has to do with the motivation to flee. Because any juror who understands that this is a guy facing homicide charges says, oh, yeah, we know why this guy needed to run. We know why he needed to get that emergency passport to get back to the U.S. Yeah, we know why he needed to run, because he was facing 15 to 30 years. That doesn't provide a motivation to run. Independently of the nature of the charge? Again, it's not 15 to 30 years. It's possible penalties of up to 15 to 30 years. I have to say, this strikes me as very much like Veridacus in the sense that the government is pushing the admissibility of this evidence to the absolute limit. If we're wrong, well, harmless error will take care of it. I mean, that's really what we're hearing today. I mean, with all due respect, you have not offered a rationale why the specification of the homicide charge was necessary to establish the rationale that you invoke for special relevance, motivation. I just don't get the difference.  Well, I don't want to beat a dead horse. I think I've given... I guess I'm asking you... I've given... Well, I'll just say it again. The idea that these charges were serious says very little, we think. I mean, it could capture a range of things. The idea that the possible penalties were up to 15 to 30 years, again, doesn't really capture the gravity of the predicament that this defendant found himself in. What makes it worse than it was homicide? I mean, it's a 15 to 30 year potential penalty. At the end of the day, that's what he faces. That's what he's running from, whether it's a fraud, a drug, or whatever. That's the world he's in, and that's why he ran. What does the homicide add? Most jurors understanding that the charge is homicide will understand why it's likely that the penalty is actually probably going to be up in that range, and maybe even at the high end of that range. As Judge Howard pointed out, we have fraud offenses that carry maximums like that, and defendants routinely get far less, I mean, months. So I think the word homicide, the label for what these charges were, tells the jury a lot about whether he was actually going to face serious jail time up in the neighborhood of the 15 to 30 year neighborhood. This is not just a fraud offense, and it's not some other offense that just has a statutory maximum that is up in the stratosphere, but the defendant can get a lesser penalty for it. And Judge Gorton appreciated the fact that the word homicide would have potential to create prejudice. That's why he limited us to just the bare fact of the charges, and why he gave a cautionary instruction as he did, and why our closings hewed completely to the theory of special relevance. The quotation from our opening, and the same one as in our closing, they both begin with saying this case is not about the charges in Cape Verde. It's what the defendant did to avoid facing them. That's the whole motive thing. That's why, jury, you should look at these charges. Not because they have any other relevance to this case, but because they tell us something about why he went from Cape Verde to Dakar, and why he desperately needed that emergency cap. Which is what worries me about the voir dire. So I'll let you do the preservation argument last, but just let's assume that's not a problem just for a second. In my own experience, I've saw many, many people come to the sidebar and say, if they're charged with something, it's possible or likely that they did it. And people shouldn't say that, but they often say that. And what is troubling here is the first they hear of this is after they are sat as jurors where we don't know the effect of being told that this guy has been charged with two homicides at two different times in Cape Verde. That's a very significant fact that jurors will have different kinds of reactions to. And by not asking the question, that just faded into the mist. Right. Well, so as we point out in the brief, the defense first proposed a list of voir dire questions two weeks prior to trial. And one of the questions in the list had to deal with the Cape Verde murder charges. And I agree with my sister that at that juncture, the defense didn't know for sure whether that was coming in, but wanted to put on the judge's radar screen, this is a question that we want you to ask if it does. Fast forward two days. We get to the pretrial conference. This is two days after the defense submits its list. There is a discussion of voir dire issues at that. There is no discussion, however, of any of the questions the defense has proposed. Fast forward to the- Has he ruled yet at that point on the eliminate motion? I don't. I actually just don't know from memory whether it's at the pretrial conference. A timeline. Yeah. Have a timeline which at least suggests that on September 18th at the final pretrial conference, he granted the government's motion to admit the evidence of the homicides as part of the stipulation. And then he subsequently, he knows he's made that ruling. He then conducts the voir dire. And even though he knows he's made that ruling, that these charges are going to come before the jury, he does not ask the questions that defense has asked him to ask about how they would be affected by that evidence. So you're reminding me that the ruling came at the pretrial conference, which I had forgotten. But if that's so, then why during the discussion of voir dire that takes place at that pretrial conference, is there no follow-up by the defense about- Do you think this is a plain error? I mean, it seems very problematic to not figure out what jurors would think about hearing that a guy has two murder conviction, I'm sorry, charges that they're going to be deciding about. And they know nothing about that. So a couple points about that, Your Honor. First of all, as we've pointed out, the Urien case, the Cesar case of this court, all I think support the idea that this was not preserved. Now, my sister has taken the approach of saying, it was, and I'm not going to discuss the plain error standard or try to meet it. That's classic Pepin waiver. And the answer is no. This is not a situation, we feel, where the judge had a duty, sua sponte, to raise this question at voir dire. There are strategic reasons why a defense attorney might not want the veneer panel to be thinking about homicide charges at an early point in the case. There was also no effort by the defense to say, well, at the start of trial, judge, we want you to cover this. There was also no attempt, when the evidence came in, of the defense to ask the court for a limiting instruction at that point. So there are a whole series of missed opportunities where Judge Gordon could have been alerted to this fact. Every single opportunity was missed, from the pretrial conference, to the two-hour impanelment, to the start of the trial, to when the evidence actually came in. None of these junctures is the court alerted to that, and there's no attempt to meet the standard in the ply brief. Perhaps preservation could have been handled better. On the other hand, as your opponent has pointed out, the court makes the ruling through a stipulation. The jury's going to know that he was charged with homicide in Cape Verde. He then proceeds, subsequent to that, to, I think this was a representation, to ask the jury all of the questions that were proposed, except the questions that would have advised them about how would they react to evidence of murder charges. Seems quite a fair inference that the judge has made a calculated decision not to ask those questions. It wasn't a mistake. It's just as easily an oversight. In fact, the fact that the judge gave, I wouldn't say all, but some of the defense-proposed questions, but not this one, doesn't tell you that the judge deliberately chose not to ask this one. If anything, it may suggest that the judge simply overlooked that question. This is the quintessential sort of moment where we expect defense attorneys, if they're that concerned about this issue, to say, Judge, can you just ask that other question that we proposed concerning the Cape Verde charges? That didn't happen here, nor did the defense ask for a limiting instruction when the evidence came in, which, in the aggregate, suggests that the defense wasn't actually as concerned at the trial level with this issue as they now are on appeal. And with that, we'll rest on the brief. Thank you, Mr. Hawker. May it please the Court, if I could just address a couple of the issues raised by the government. As to the government's argument that it wasn't used as a propensity evidence and that it wasn't argued that it was more likely that he would commit passport fraud because he was charged with these two homicides, I would just point to the government's closing, where their overarching argument was that Mr. Brandeo had fled justice, was their words, fled justice for the homicides in Cape Verde, which was far more prejudicial than just if he fled 15 to 30 years. The innuendo was that he was fleeing homicide charges, which he never was punished for, that there was deaths in the other country, rather than just learning that he was charged with two very serious offenses, and that he's now fled to the United States and is living in the United States. But their words were fled justice? That was the government's closing argument. They argued that he fled justice for two homicide charges. For the homicide charges? Yes, Your Honor. Did they specifically refer to the homicide charges or did they just say fled justice? That he fled justice for the homicide charges in Cape Verde. They said that's what we're here for because he fled justice. So it's just as bad as propensity. We're merging things here because you said earlier it would have been okay to say he was facing serious crimes, crimes up to 15 to 30 years. If he's leaving those, even if they're drugs or something else, he's fleeing justice. So that would be an okay thing to say, but if the focus is on homicide, it might change it. So what was it? I don't think those are inconsistent arguments, Your Honor. I think the argument is that if he, I think it's problematic that they said fled justice, but I think it's more problematic that he fled justice for homicide charges. And the innuendo that's coming with that, that there was two separate homicides committed. He'll never face trial. He'll never be potentially punished for those offenses. So I think that's what makes it more prejudicial. And as Your Honor stated, it doesn't go to, the homicides aren't any more relevant to motive than any offenses that carry long penalties in a foreign country. Thank you. Thank you. All rise. The court is in recess for five minutes.